STATE OF NORTH CAROLINA v. HERMAN WILLIAMS, JR.

No. 50A84

(Filed 7 January 1986)

1. **Searches and Seizures § 40— padlock not listed in search warrant—relevant to crime—lawfully seized**

   In a prosecution for first degree murder, a padlock was lawfully seized from the motel room where defendant was arrested and the trial court did not err in denying defendant's motion to suppress that evidence where the lock was found as the result of a search carried out under a warrant specifying items of bloody clothing as the items to be seized; the padlock was found under a telephone directory and it is not beyond reason that pieces of clothing could be found under, behind or even inside a telephone book; the telephone book was on a table beside the bed and the facts tended to show that defendant was awakened by the police and would support an inference that incriminating evidence may have been hurriedly hidden in close proximity to the bed; the crime scene technician who found the padlock testified at trial that he was unaware of the contents of the warrant but defendant failed to point to any evidence before the judge at the suppression hearing that indicated that the technician did not know the scope of the warrant; this lack of knowledge at the time of the search would not render an otherwise lawful search invalid; the discovery of the padlock was inadvertent because there was no indication that any officer had probable cause to believe the padlock was in the motel room; and it was immediately apparent upon discovery that the padlock constituted evidence in the case in that an officer knew that a padlock was missing from the victim's house, stated that it was relevant to the case, and immediately tried to open the lock with a key which was discovered near the body of the victim. N.C.G.S. 15A-253.

2. **Jury § 7.11; Constitutional Law § 63— death-qualified jury—constitutional**

   The practice of death qualifying the jury did not deprive defendant of a fair trial.

3. **Criminal Law § 87.4— redirect examination—testimony concerning investigator's suspicions—admissible as explanation of cross-examination**

   The trial court did not err in a prosecution for first degree murder by admitting on redirect examination testimony by an investigator that he believed defendant's girlfriend suspected defendant of some involvement in the killing

where the officer had been asked on cross-examination if he had become suspicious of the girlfriend prior to her inculpatory statements and had responded that he was suspicious of her knowledge, not her actions. Evidence explanatory of testimony brought out on cross-examination may be elicited on redirect examination even though it might not have been admissible in the first instance; furthermore, the jury already had before it evidence tending to indicate that the girlfriend did in fact suspect that defendant had murdered her mother.

**4. Homicide § 30— first degree murder—no instruction on second degree—no error**

The trial court did not err in a first degree murder prosecution by refusing to instruct the jury on second degree murder where the evidence showed defendant and his girlfriend had discussed killing the victim in order to collect her life insurance; the victim was severely beaten about the head and strangled with a telephone cord; the medical examiner characterized the strangulation as a finishing type of assault, done to silence the individual; defendant presented no evidence which would rebut the State's theory of the murder; and a finding that defendant perpetrated the killing in the heat of passion would require a piecemeal acceptance of the State's evidence.

**5. Homicide § 25— first degree murder—instructions on murder weapon—no error**

The trial court did not err in its instructions to the jury in a first degree murder prosecution by instructing the jury to consider whether a frying pan or a telephone cord were dangerous weapons where the evidence showed that a telephone cord was found wrapped around the victim's neck and mouth, a frying pan was sitting on a bar area near the body, broken pieces of the frying pan were found on the floor near the body, a glass ashtray was also discovered near the body, no blood or fingerprints were found on the frying pan, the ashtray was found near it, and defendant's girlfriend's fingerprints were found on the ashtray along with bloodstains. Under the State's theory of the case, defendant's guilt depended on whether he utilized the frying pan and telephone cord to perpetrate the killing; the fact that the ashtray could also have been used to kill the victim and that it was linked to another person was merely evidence favorable to defendant which was thoroughly reviewed in the court's summation of the evidence.

**6. Criminal Law § 122.2— failure to reach a verdict—incomplete additional instructions—no plain error**

There was no prejudicial error in a prosecution for first degree murder where the jury began its deliberations at 2:04 p.m. on 3 October; the evening recess was taken at 5:25 p.m.; the jury resumed deliberating the next morning at 9:05 p.m., returned to the courtroom at 9:50 p.m. and announced that they had been unable to reach a verdict; the court inquired into the numerical division of the jury and instructed them to resume deliberations at 9:53 a.m.; the jury deliberated throughout the day and was allowed to examine certain exhibits in the courtroom; the jury returned to the courtroom at 5:37 p.m. and handed the judge a written list of questions asking for an examination of additional exhibits and a review of certain testimony; the court was recessed for

the evening; the next morning the jury was permitted to examine certain items of evidence and was instructed to return to the jury room and continue deliberations; and the jury returned with a verdict of guilty of first degree murder twenty minutes later. The trial court's inquiry into the jury's numerical division was not error *per se*, but the court erred by giving the instructions set out in N.C.G.S. 15A-1235(b)(1) and (2), but not the instructions set out in N.C.G.S. 15A-1235(b)(3) and (4); however, defendant did not object to the incomplete instruction and it was not "plain error" entitling defendant to a new trial.

Justice BILLINGS did not participate in the consideration or decision of this case.

BEFORE *Allen, J.*, at the 19 September 1983 Criminal Session of Superior Court, MECKLENBURG County, defendant was convicted of first-degree murder. Following a sentencing hearing conducted pursuant to N.C.G.S. § 15A-2000, the jury found the existence of both aggravating and mitigating circumstances and concluded that, although the mitigating circumstances were insufficient to outweigh the aggravating circumstances, the aggravating circumstances were not sufficiently substantial to call for the imposition of the death penalty. Based upon the jury's recommendation, the trial court entered judgment sentencing the defendant to life imprisonment. The defendant appeals as a matter of right pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 11 April 1985.

*Lacy H. Thornburg, Attorney General, by David Roy Blackwell, Assistant Attorney General, for the State.*

*Ann B. Petersen for defendant-appellant.*

MEYER, Justice.

The defendant brings forward several assignments of error relating to the admission of evidence, the jury instructions, and the practice of permitting the State to impanel a "death-qualified" jury at the guilt-innocence phase of his first-degree murder trial. We conclude that the defendant received a fair trial, free from prejudicial error.

The State's evidence tended to show that Bobbie Elizabeth Fowler worked as a nurse's aid at the Nalle Clinic in Charlotte, North Carolina. On the afternoon of 7 February 1983, Fowler obtained a ride home from a co-worker at the clinic. She was

dropped off at her duplex at 1025 Holland Avenue at approximately 5:45 p.m.

Shortly after 9:00 p.m., some of Fowler's relatives called the Charlotte Police Department and stated that they had been unable to get her to answer her door. Officer D. L. Powell was dispatched to the scene and met a number of people in front of the house, including Mrs. Fowler's daughter, Sheila Fowler. Powell checked the outside of the building and discovered a side door standing slightly ajar. Powell entered the residence and discovered Mrs. Fowler lying on the living room floor. He observed a pool of blood under her head and a telephone cord stretching from the wall which was wrapped around her neck and through her mouth. A check for vital signs revealed that Mrs. Fowler was dead. Powell then notified the dispatcher of his discovery and requested assistance.

A search of the residence revealed a state of general disarray, as though the apartment had been ransacked. Drawers had been pulled out, a number of items were lying on the floor, mattresses were displaced, clothes had been pulled out of closets, and the victim's purse was found near the body with its contents dumped on the floor. Evidence indicated that there had been a considerable struggle between Mrs. Fowler and the attacker. Blood was splattered on the living room walls and on the living room furniture. The telephone cord was wrapped around her neck and her mouth. A frying pan was sitting on a bar area near the body. Broken pieces of the frying pan and of a ceramic ashtray were discovered on the floor near the victim's head.

Initially, the police were of the opinion that Mrs. Fowler had been killed during the perpetration of a burglary. However, later, the police concluded that there had been no burglary and that the residence had been ransacked in order to make it appear as though a break-in had occurred. The police based this belief in part on the fact that there were no signs of a forced entry and the front door was locked from the inside. Also, many items which might ordinarily be taken in a burglary were left in the residence.

Dr. Hobart Wood, the Mecklenburg County Medical Examiner, performed an autopsy on the body of the victim. During the course of the autopsy, Dr. Wood discovered that Mrs. Fowler

had suffered two lacerations to the head and a fractured skull. These injuries caused considerable hemorrhaging of the brain. He also observed a number of abrasions on her face. Dr. Wood testified that, in his opinion, Mrs. Fowler died as a result of ligature strangulation and an acute head injury. Dr. Wood placed the time of death at some time between 6:00 p.m. and 9:00 p.m. on 7 February 1983.

On the night that her mother's body was discovered, Sheila Fowler went to the Law Enforcement Center and gave a statement as to what she had observed at the scene prior to calling the police. Two days later, she agreed to meet with the officers to go over her statement. The meeting soon became an interrogation, and Miss Fowler eventually gave a statement implicating herself and the defendant in the murder of her mother. The officers obtained a warrant for the defendant's arrest and subsequently apprehended him at a local motor lodge.

At trial, Sheila Fowler testified that she had been charged with first-degree murder and that she was testifying pursuant to a plea agreement under which she would be permitted to plead guilty to second-degree murder in exchange for her truthful testimony at the defendant's trial. Sheila stated that she was originally from Charlotte, but had lived for the past several years in California. She testified that she had met the defendant in California the previous summer. They became romantically involved and lived together for seven months until she returned to Charlotte in November 1982.

Upon her return to Charlotte, Sheila began living with her mother during the week and spending the weekends with her grandmother. Sheila testified that she and her mother argued quite often, usually in regard to her inability to find employment and the financial burden that she was placing on her mother. She stated that approximately a week before the killing, they got into an argument and her mother struck her in the neck with a hacksaw.

The defendant arrived in Charlotte a week before the killing. When he arrived, Sheila told the defendant about the argument in which her mother hit her with the hacksaw, as well as other incidents which had occurred over the years. At some point, she and the defendant began to discuss the possibility of killing her

mother. Sheila stated that she told the defendant that her mother had approximately $10,000 of life insurance. She testified that upon being informed of the existence of this insurance money, the defendant stated, "You realize what we could do with that $10,000?"

Sheila saw the defendant every day from then until 7 February. On the afternoon of 7 February, she and the defendant were at her mother's house when Mrs. Fowler called. Sheila and her mother had a violent argument. After the call, Sheila told the defendant, "We should have went on and did what we talked about." She also told him that she did not care how he "did it"; she just wished he would "do it."

Subsequently, Mrs. Fowler called back. Sheila told her that she was going to visit her (Sheila's) son at his father's parents' house and that she would leave the house key in the mailbox. At approximately 3:30 p.m., the defendant left to return to his motel. Sheila left about an hour later. While at the home of her son's grandparents, Sheila was informed that people had been trying unsuccessfully to reach her mother. She called her mother's house, but was unable to get an answer. She left her son's grandparents' house at approximately 8:30 p.m. and returned home. After being unable to get her mother to answer the door, Sheila contacted the police. Mrs. Fowler's body was subsequently discovered in the apartment.

The next day, Sheila met with the defendant. She testified that the defendant told her that he had killed her mother and that he had made it look like a robbery. The defendant said that there had been a struggle and indicated that the frying pan had been broken during the fight.

The State also presented evidence that one of the defendant's fingerprints was found on the telephone whose cord was found wrapped around the victim's neck. The State also introduced as evidence a padlock that was discovered in the defendant's motel room shortly after his arrest. A key found near the body of the victim opened the padlock.

Stroud Johnson, who lived across the street from Mrs. Fowler, testified for the defendant. He stated that at some point between 8:00 and 8:30 p.m. on the night in question, he saw Mrs.

Fowler's boyfriend drive up and go inside her house. Johnson stated that the boyfriend stayed inside for a few minutes, came out, quickly got in his car, and raced away. The defendant also presented evidence that Sheila Fowler's fingerprints were discovered on a bloodstained, glass ashtray found lying next to the victim and that heel prints discovered on the kitchen floor were inconsistent with the shape and size of the heels of his boots.

Based on this evidence, the jury found the defendant guilty of first-degree murder. Following a sentencing hearing, the jury recommended that the defendant be sentenced to life imprisonment, and the trial court entered judgment accordingly.

[1] The defendant initially argues that the trial court erred in denying his motion to suppress the introduction into evidence of the padlock which was discovered in the motel room. He contends that the padlock was seized as a result of a search which was outside the scope of the search warrant and that it was therefore inadmissible. We do not agree.

Prior to trial, the defendant moved to suppress the introduction of the padlock into evidence. Evidence presented at the suppression hearing tended to show that after Sheila Fowler gave a statement implicating herself and the defendant in the killing, the police obtained a warrant for the defendant's arrest. During the early morning hours of 10 February 1982, Investigator S. C. Cook and other law enforcement officers proceeded to a local motel where the defendant was staying. The officers knocked on the motel room door, and the defendant answered wearing only a blanket wrapped around him. The defendant was placed under arrest, allowed to dress, and transported to the Law Enforcement Center. Cook determined that the room should be searched, and an officer was instructed to stand watch outside the motel room while a search warrant was obtained.

Cook subsequently obtained a warrant to search the motel room, and he and several other police officers then proceeded to the motel to execute the warrant. The only items specified in the warrant for seizure were items of bloody clothing.

One of the members of the search team was crime scene technician Thomas Griffith. Shortly after entering the room, Griffith walked over to an end table beside the bed. He observed a tele-

phone directory on the bottom shelf and picked it up. He discovered the padlock underneath the telephone book and asked the other officers if a padlock had any relevance to the case. Cook responded affirmatively, as he was aware that the padlock that had been on the victim's front door was missing. The padlock was then photographed and seized.

The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause, supported by Oath or affirmation and *particularly describing the place to be searched and the persons or things to be seized.* (Emphasis added.)

N.C.G.S. § 15A-253 provides in part "[t]hat the scope of the search may be only such as is authorized by the warrant and is reasonably necessary to discover the items specified therein." The defendant argues that the padlock was not discovered as a result of a search for bloody clothing and that the evidence should have been excluded.

The fourth amendment's requirement that warrants must particularly describe the items to be searched for and seized is designed to prevent law enforcement officials from engaging in general searches. *See Marron v. United States,* 275 U.S. 192, 72 L.Ed. 231 (1927). However, in *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L.Ed. 2d 564, *reh'g denied,* 404 U.S. 874, 30 L.Ed. 2d 120 (1971), the U.S. Supreme Court held that the police may seize without a warrant the instrumentalities, fruits, or evidence of crime which is in "plain view" if three requirements are met. First, the initial intrusion which brings the evidence into plain view must be lawful. *Id.* at 465, 29 L.Ed. 2d at 582. Second, the discovery of the incriminating evidence must be inadvertent. *Id.* at 469, 29 L.Ed. 2d at 585. Third, it must be immediately apparent to the police that the items observed constitute evidence of a crime, are contraband, or are otherwise subject to seizure. *Id.* at 466, 29 L.Ed. 2d at 583. We conclude that these requirements were clearly met and that the padlock was therefore lawfully seized pursuant to the "plain view" exception to the fourth amendment's warrant requirements.

First, as to the requirement that the initial intrusion which brings the evidence into view be lawful, the Supreme Court specifically stated in *Coolidge* that the "plain view" doctrine was applicable to a situation where, in the course of a search pursuant to a warrant authorizing a search for specific items, the police discovered other evidence. *Coolidge*, 403 U.S. at 465, 29 L.Ed. 2d at 582. Furthermore, a warrant authorizing a search for particular items gives authority to search anywhere the items might reasonably be expected to be found. *See United States v. Ross*, 456 U.S. 798, 72 L.Ed. 2d 572 (1982); *United States v. Wright*, 704 F. 2d 420 (8th Cir. 1983); *United States v. Newman*, 685 F. 2d 90 (3rd Cir. 1982); *Briscoe v. State*, 40 Md. App. 120, 388 A. 2d 153 (1978); *State v. Thisius*, 281 N.W. 2d 645 (Minn. 1978). N.C.G.S. § 15A-253 incorporates this view.

The defendant, however, argues that it should not have been reasonably expected that the items specified in the warrant—bloody clothing—would be found under a telephone book. We disagree. It is common knowledge that telephone directories are often quite bulky. It is not beyond reason that a bloody sock, tie, belt, or undergarment—all pieces of clothing—could be hidden under, behind, or even inside a telephone book. Additionally, we feel it is important to note the surrounding circumstances preceding the search. The defendant was arrested in the early morning hours after the police had knocked on his door. When he answered the door, he was wearing only a blanket. The telephone book was located on a table beside the bed. These facts tend to show that the defendant was awakened by the police and would support an inference that incriminating evidence may have been hurriedly hidden in a location in close proximity to the bed.

The defendant argues that Officer Griffith had not read the search warrant nor had he been told that the warrant limited the search to one for bloody clothing. The defendant appears to contend that this somehow converted Griffith's actions into an impermissible general search. We do not agree. We note that Griffith did not testify at the suppression hearing, and the defendant has failed to point to any evidence before the judge at the suppression hearing that indicated that Griffith did not know the scope of the warrant. It therefore appears that the judge did not have an opportunity to pass upon this question at the hearing. In addition, although Griffith did testify at the trial that he was unaware of

the contents of the warrant, this lack of knowledge at the time of the search would not render an otherwise lawful search invalid. *See United States v. Bugarin-Casas*, 484 F. 2d 853 (9th Cir. 1973), *cert. denied*, 414 U.S. 1136, 38 L.Ed. 2d 762 (1974). Since Griffith did, in fact, search in a location where the items specified in the warrant might have been reasonably expected to be found, his lack of knowledge as to the scope of the warrant will not render the seizure and subsequent admission of the padlock invalid.

As for the requirement that the discovery of the evidence be inadvertent, the Supreme Court stated in *Coolidge* that discovery of evidence is inadvertent when it is not anticipated that the evidence will be found. In interpreting this requirement, some courts have said that inadvertence means the police must be without probable cause to believe that the evidence would be discovered and the mere suspicion that discovery would occur is insufficient to preclude application of the "plain view" doctrine. *United States v. Liberti*, 616 F. 2d 34 (2nd Cir.), *cert. denied*, 446 U.S. 952, 64 L.Ed. 2d 808 (1980); *United States v. Hare*, 589 F. 2d 1291 (6th Cir. 1979). This Court has interpreted the requirement as meaning that there must be no intent on the part of the investigators to search for and seize the contested items not named in the warrant. *State v. Richards*, 294 N.C. 474, 242 S.E. 2d 844 (1978).

Although Cook knew the padlock was missing from the victim's house, there is nothing to indicate that he or any other officer had probable cause to believe the item was in the motel room. At most, the evidence only raised a mere suspicion that the padlock might be discovered there. Also, there is no indication that the officers intended to search for and seize the padlock.

Finally, we consider the question of whether it was immediately apparent upon discovery that the padlock constituted evidence in the case and was therefore subject to seizure. In *Texas v. Brown*, 460 U.S. 730, 75 L.Ed. 2d 502 (1983), the Supreme Court appeared to say that the "immediately apparent" requirement was met where the police had probable cause to associate the property with criminal activity. The facts clearly show that this standard was met here. Cook knew that a padlock was missing. As soon as Griffith announced that he discovered the padlock, Cook stated that it was relevant to the case. Cook immediately at-

tempted to open the lock with a key which was discovered near the body of the victim. This evidence clearly shows that Cook recognized the evidentiary importance of the padlock immediately upon its discovery.

For the foregoing reasons, we conclude that the padlock was lawfully seized from the motel room and that the trial court did not err in denying the defendant's motion to suppress the evidence. This assignment of error is overruled.

[2] The defendant next argues that the practice of "death-qualifying" the jury prior to the guilt-innocence determination phase of his trial resulted in a jury biased in favor of the prosecution on the issue of guilt and therefore constituted a deprivation of his constitutional right to a fair trial. We have consistently rejected such arguments. *E.g., State v. Payne,* 312 N.C. 647, 325 S.E. 2d 205 (1985); *State v. Noland,* 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied,* --- U.S. ---, 84 L.Ed. 2d 369, *reh'g denied,* --- U.S. ---, 85 L.Ed. 2d 342 (1985); *State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197, *cert. denied,* --- U.S. ---, 83 L.Ed. 2d 299 (1984). This assignment of error is without merit.

[3] The defendant's next assignment of error concerns the admission of certain testimony by Investigator Rick Sanders. During redirect examination, the prosecutor asked Sanders what he suspected Sheila Fowler knew about the killing. Over objection, the officer testified that, based on information he had, he believed that Sheila suspected the defendant of some involvement. The defendant argues that this testimony was irrelevant and that its prejudicial effect entitles him to a new trial.

Initially, we note that during cross-examination, Sanders was asked if it was not true that prior to the time of Sheila Fowler's inculpatory statement, he had become suspicious of some of her actions. Sanders responded that his suspicions were not in regard to her actions, but were directed at her knowledge of the killing. It is well settled that evidence explanatory of testimony brought out on cross-examination may be elicited on redirect even though it might not have been properly admissible in the first instance. *E.g., State v. Love,* 296 N.C. 194, 250 S.E. 2d 220 (1978). We feel that Sanders' testimony on redirect was designed to explain his cross-examination testimony.

Furthermore, assuming, *arguendo*, that the testimony was irrelevant, its erroneous admission was clearly harmless in light of Sheila Fowler's testimony. Prior to Sanders' testimony, Sheila stated that she and the defendant had previously discussed killing her mother; that after the discovery of the body, she asked the defendant if he killed her mother; and that he admitted killing her. Therefore, prior to Sanders' objected-to testimony, the jury had before it evidence tending to indicate that Sheila Fowler did, in fact, suspect that the defendant had murdered her mother. It is therefore clear that the admission of Sanders' testimony, if error, could not have influenced the verdict against the defendant. This assignment of error is overruled.

[4] The defendant next contends that the trial court erred by refusing to instruct the jury concerning the lesser-included offense of second-degree murder. He argues that the evidence could have raised a reasonable doubt in the minds of the jurors as to whether the killing was committed with premeditation and deliberation and that he was therefore entitled to an instruction on second-degree murder. We disagree.

In *State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645 (1983), we held that a trial judge is not required to give an instruction on second-degree murder in all first-degree cases, but may only instruct on second-degree murder when the evidence supports such a charge. In discussing the evidentiary requirement necessary to support an instruction on second-degree murder, we stated:

> We emphasize again that although it is for the jury to determine, from the evidence, whether a killing was done with premeditation and deliberation, the mere possibility of a negative finding does not, in every case, assume that defendant could be guilty of a lesser offense. Where the evidence belies anything other than a premeditated and deliberate killing, a jury's failure to find all the elements to support a verdict of guilty of first degree murder must inevitably lead to the conclusion that the jury disbelieved the State's evidence and that defendant is not guilty. The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is

*no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*Id.* at 293, 298 S.E. 2d at 657-58.

Applying this standard to the facts of the case, it is clear that the defendant was not entitled to an instruction on second-degree murder. The State's evidence shows that the defendant and Sheila Fowler had discussed killing the victim in order to collect her life insurance. The victim was severely beaten about the head and was strangled with a telephone cord. Dr. Wood characterized the strangulation as a "finishing type of assault, done to silence the individual." The evidence clearly supports a finding of premeditation and deliberation. The defendant presented no evidence which would rebut the State's theory of the murder. He did not testify in his own behalf, and his defense consisted of attempts to discredit Sheila Fowler and to raise the possibility that someone else, specifically the victim's boyfriend, perpetrated the killing. In other words, the only evidence tending to negate the required elements of first-degree murder was the defendant's silent, yet implicit, denial that he committed the crime. Under *Strickland*, this does not entitle him to an instruction on second-degree murder.

The defendant argues, however, that the evidence could support a finding that he perpetrated the killing in a heat of anger brought on by his concern over the victim's treatment of his girlfriend, Sheila Fowler. Such a finding would require the jury to accept the State's evidence that the defendant was the killer, but reject the evidence tending to show that he acted with premeditation and deliberation. The mere possibility of the jury's piecemeal acceptance of the State's evidence will not support the submission of an instruction on a lesser-included offense. *State v. Hicks*, 241 N.C. 156, 84 S.E. 2d 545 (1954). This assignment of error is overruled.

[5] The defendant's next assignment of error concerns the trial court's instruction regarding the possible murder weapon. The evidence showed that a telephone cord was found wrapped around the victim's neck and mouth. A frying pan was sitting on a bar area near the body. Broken pieces of the frying pan were

found on the floor near the body. A glass ashtray was also discovered near the body. No blood or fingerprints were found on the frying pan. However, the ashtray was bloodstained, and Sheila Fowler's fingerprints were discovered on it.

The trial judge instructed the jury to consider whether the telephone cord or the frying pan were dangerous weapons, but did not mention the ashtray as a possible murder weapon. The defendant argues that because the ashtray tended to link another person to the crime, the trial court erred by failing to instruct the jury to consider whether the ashtray was a possible murder weapon. We find this argument to be meritless. At no time did the State contend that the defendant used the ashtray to commit the murder. Under the State's theory of the case, the defendant's guilt depended on whether he utilized the frying pan and/or the telephone cord to perpetrate the killing. The fact that the ashtray could have also been used to kill the victim and that it was linked to another person was merely evidence favorable to the defendant, which was thoroughly reviewed by the trial court in its summation of the evidence.[1] This assignment of error is overruled.

[6] In his final assignment of error, the defendant claims that the trial court made statements to the jury during its deliberations which tended to coerce a verdict in favor of the prosecution. We do not agree.

The jury retired to begin its deliberations at 2:04 p.m. on 3 October 1983. The evening recess was taken at 5:25 p.m. The jury resumed deliberating the next morning at 9:05 a.m. At 9:50 a.m., the jury returned to the courtroom, and the foreman announced that the jury had been unable to reach a verdict. The following exchange then took place:

> THE COURT: Now, I want to ask you some questions. I want to know numbers. I don't want to know on which side the numbers are. All I want to know is the numbers. Do you understand what I'm referring to?
>
> FOREMAN: Yes.

---

1. We note that N.C.G.S. § 15A-1232 was recently amended so as to no longer require trial judges to state, summarize, or recapitulate the evidence or to explain the application of the law to the evidence. 1985 N.C. Sess. Laws ch. 537, § 1. They may, however, elect to do so through the exercise of their discretion.

THE COURT: When did you take your first vote yesterday?

FOREMAN: About 5:00.

THE COURT: What was the vote at that time?

FOREMAN: The vote at that time was —

THE COURT: Just the numbers.

FOREMAN: Ten and one.

THE COURT: And one abstention?

FOREMAN: One undecided.

THE COURT: Now, when did you take your first vote this morning?

FOREMAN: We did not specifically take a vote.

THE COURT: All right, but the one vote did not change?

FOREMAN: Right.

THE COURT: All right. You all resume your deliberations. Thank you.

The jury resumed its deliberations at 9:53 a.m. The defendant then moved for a mistrial based on the grounds that the foreman had expressly stated that the jury had been unable to reach a verdict. The motion was denied.

The jury continued to deliberate throughout the day and, at one point, was allowed to examine certain exhibits in the courtroom. At 5:37 p.m., the jury returned to the courtroom and handed the judge a written list of questions asking for an examination of additional exhibits and a review of certain testimony. The judge told the jury he would review the requests and recessed court for the evening.

The next morning, the defendant renewed his motion for a mistrial based on the fact that the jury had deliberated for a day and a half without reaching a verdict. The motion was again denied. The court then permitted the jury to examine certain items of evidence. The trial judge went on to state:

Now, Members of the Jury, the Court has not summarized all of the evidence in this case, but it is your duty to remember all of the evidence, whether it's been called to your attention or not, and if your recollection of the evidence differs from that of the Court or differs from that of the defense attorney or the District Attorney, you are to rely solely on what your recollection is in your deliberation. You all have a duty to consult with one another to deliberate with a view to reaching an agreement, if it can be done without violence to your individual judgment, and each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. I will ask you to return to the jury room and continue your deliberations, please.

Approximately twenty minutes later, the jury returned with a verdict finding the defendant guilty of first-degree murder.

The defendant initially contends that the trial court's inquiry into the numerical division of the jurors constituted *per se* reversible error. The defendant acknowledges that this issue was decided against him in the recent case of *State v. Fowler*, 312 N.C. 304, 322 S.E. 2d 389 (1984), but nevertheless urges us to reconsider our decision in that case. He has failed to present any arguments in support of this request, and we decline to depart from former Justice Copeland's well-reasoned opinion in *Fowler*.

The defendant next argues that the trial court's failure to instruct the jury in accordance with N.C.G.S. § 15A-1235 had the effect of coercing a verdict in favor of the prosecution. N.C.G.S. § 15A-1235 provides:

(a) Before the jury retires for deliberation, the judge must give an instruction which informs the jury that in order to return a verdict, all 12 jurors must agree to a verdict of guilty or not guilty.

(b) Before the jury retires for deliberation, the judge may give an instruction which informs the jury that:

(1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment;

(2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(3) In the course of deliberations a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(c) If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the instructions provided in subsections (a) and (b). The judge may not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(d) If it appears that there is no reasonable possibility of agreement, the judge may declare a mistrial and discharge the jury.

The defendant's argument centers on the fact that when instructing the jury prior to the commencement of their deliberations on the morning the verdict was returned, the trial judge failed to give the instructions set out in N.C.G.S. § 15A-1235(b)(3) and (4) (i.e., that during the course of deliberations, a juror should not hesitate to reexamine his views and change his opinion if convinced it is erroneous and that no juror should surrender his honest conviction solely because of the opinions of other jurors or merely for the purpose of returning a verdict).

We have said that this statute is the "proper reference for standards applicable to charges which may be given a jury that is apparently unable to agree upon a verdict." *State v. Easterling*, 300 N.C. 594, 608, 268 S.E. 2d 800, 809 (1980). We have also noted that the language of N.C.G.S. § 15A-1235(c) is permissive rather than mandatory, as the trial judge *may* give the instructions delineated in N.C.G.S. § 15A-1235(a) and (b) if he believes the jury is unable to agree upon a verdict. *State v. Peek*, 313 N.C. 266, 328 S.E. 2d 249 (1985). It is clearly within the sound discretion of the

trial judge as to whether to give an instruction pursuant to N.C.G.S. § 15A-1235(c).

However, in the official commentary to N.C.G.S. § 15A-1235, the Criminal Code Commission expressed its opinion that once the trial judge gives any of the instructions set out in N.C.G.S. § 15A-1235(b), he must give all of the instructions. Although the official commentary was not drafted by the General Assembly, we believe its inclusion in The Criminal Procedure Act is some indication that the legislature expected and intended for the courts to turn to it for guidance when construing the Act. We consider the official commentary to be merely persuasive authority, *see, e.g., State v. Lester*, 294 N.C. 220, 240 S.E. 2d 391 (1978), and it is therefore not binding on us.

In this case, we find the logic of the official commentary to be persuasive and therefore hold that whenever the trial judge gives the jury any of the instructions authorized by N.C.G.S. § 15A-1235(b), whether given before the jury initially retires for deliberation or after the trial judge concludes that the jury is deadlocked, he must give all of them.

The State argues that, here, the instruction was not given pursuant to N.C.G.S. § 15A-1235(c) because there was no indication that the jury was deadlocked. We disagree. The previous morning, the jury foreman had informed the trial judge that after deliberating for several hours, there was a ten to one split, with one abstention. The jury deliberated for the remainder of the day and, immediately prior to the evening recess, asked to examine some exhibits and to have certain testimony reviewed. We believe that at the time the instruction was given, the trial judge quite reasonably believed the jury was still deadlocked. The fact that he gave two of the four instructions authorized by N.C.G.S. § 15A-1235(b) is some evidence of the fact that he felt the jury remained deadlocked. Since the trial judge gave the instruction after forming the opinion that the jury was deadlocked, he committed error when he gave the instructions set out in N.C.G.S. § 15A-1235(b)(1) and (2), but failed to give the instructions set out in N.C.G.S. § 15A-1235(b)(3) and (4).

This error does not, however, automatically entitle the defendant to a new trial. We have recognized "that every variance from the procedures set forth in the statute does not require the

granting of a new trial." *Peek*, 313 N.C. at 271, 328 S.E. 2d at 253; *see also State v. Easterling*, 300 N.C. 594, 268 S.E. 2d 800 (1980). Furthermore, as the State points out, the defendant failed to object to the incomplete instruction. Our review is therefore limited to a determination of whether the omission constituted "plain error." *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983). As stated in *Odom*:

> "[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *'fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has ' "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" ' or where the error is such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' or where it can be fairly said 'the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.' "

*Id.* at 660, 300 S.E. 2d at 378 (1983) (*quoting from United States v. McCaskill*, 676 F. 2d 995, 1002 (4th Cir. 1982) ). In order to determine whether an erroneous instruction constitutes "plain error," we must review the entire record and ascertain whether the defective instruction had a probable impact on the jury's finding of guilt. *Odom*, 307 N.C. 655, 300 S.E. 2d 375.

In this case, our review of the entire record convinces us that this error does not constitute "plain error" entitling the defendant to a new trial. The State presented overwhelming evidence of the defendant's guilt. Furthermore, before the jury initially retired to begin its deliberations, the trial judge gave all four instructions set out in N.C.G.S. § 15A-1235(b). Each juror was therefore clearly aware that he should not hesitate to reexamine his views and change his opinion if convinced they were erroneous and that he should not surrender his honest conviction solely because of the opinions of fellow jurors or merely to reach a verdict. Also, a close examination of the actual instruction given clearly shows that it could not have had a prejudicial impact. The judge instructed the jurors that they had a "duty to consult with

one another to deliberate with a view to reaching an agreement, *if it can be done without violence to your individual judgment.*" This portion of the instruction conveyed to the jurors the unmistakable message that they were not to sacrifice their individual beliefs in order to reach a verdict.

The defendant also appears to contend that a review of the entire record indicates that the trial judge coerced a verdict in favor of the State. This argument is meritless. As noted above, neither the court's inquiry into the numerical division of the jury nor the incomplete instruction tended to be coercive. The jury was not required to deliberate for an inordinate amount of time, and at no point did the jurors indicate that they were hopelessly deadlocked. The trial judge also granted the jury's requests to review exhibits introduced at trial. The record also reveals that the trial judge was polite, considerate, and accommodating toward the jury. Defendant has failed to point to any statement, act, or omission by the court which could be remotely interpreted as coercive.

We conclude that the defendant received a fair trial, free from prejudicial error.

No error.

Justice BILLINGS did not participate in the consideration or decision of this case.