STATE OF NORTH CAROLINA v. CHARLES LINDBERG GILLIKIN, III

No. COA11-607

(Filed 6 December 2011)

**1. Jury—deadlocked jury—instruction—incomplete**

Defendant was entitled to a new trial for second-degree rape
and other offenses where the trial court's instructions to a dead-
locked jury did not contain the substance of N.C.G.S. § 15A-1235(b).
Nowhere in the instruction was there a suggestion that no juror
was expected to surrender his honest conviction nor reach an
agreement that may do violence to individual judgment. The error
was not harmless because it was a close case, substantially deter-
mined by the credibility of the two primary witnesses.

**2. Criminal Law—prosecutor's closing arguments—improper**

Although a new trial was granted on other grounds, it was noted
that the prosecutor's closing arguments were grossly improper in

STATE v. GILLIKIN

[217 N.C. App. 256 (2011)]

that the prosecutor repeatedly engaged in abusive name-calling, expressed his opinion that defendant was a liar, and presented an undignified argument that was solely intended to inflame the passions of the jury. The trial court was commended for issuing a curative instruction *ex mero motu.* ·

Appeal by defendant from judgments entered 21 September 2010 by Judge Kenneth F. Crow in Carteret County Superior Court. Heard in the Court of Appeals 27 October 2011.

*Attorney General Roy Cooper, by Assistant Attorney General W. Wallace Finlator, Jr., for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Daniel R. Pollitt, for defendant appellant.*

McCULLOUGH, Judge.

On 21 September 2010, Charles Lindberg Gillikin, III ("defendant"), was convicted of second-degree rape, false imprisonment, and misdemeanor larceny. On appeal, defendant contends he is entitled to a new trial for the following reasons: (1) the State's closing argument was *ex mero motu* error; (2) the State's cross-examination of defendant was plain error; (3) the State's cross-examination of defendant's father was plain error; (4) the admission of evidence presented by a State witness about defendant's bad character was plain error; (5) the trial court's re-instructions to the deadlocked jury unconstitutionally coerced guilty verdicts; (6) the trial court unconstitutionally coerced guilty verdicts by initially instructing the jurors that they had to be unanimous; and (7) the trial court's jury instruction on flight was not supported by the evidence. Defendant also contends he is entitled to a new sentencing hearing because the trial court erroneously considered defendant's lack of contrition in determining the severity of defendant's sentence. Because we agree with defendant that the trial court's re-instructions to the deadlocked jury unconstitutionally coerced guilty verdicts, we order a new trial for defendant.

## I. Background

Beginning in December 2007, defendant and prosecutrix Trista Nicole Polk ("Polk") were involved in an off-and-on consensual sexual relationship until October 2009. A baby was born of the relationship in January 2009. In August 2009, Polk and the baby moved into an apartment on Bridges Street in Morehead City, North Carolina. Initially, defendant also lived in the Bridges Street apartment with

STATE v. GILLIKIN

[217 N.C. App. 256 (2011)]

Polk and the baby. However, the couple quickly had an argument, and Polk pressed charges against defendant for assault. Defendant then moved into a living unit at a local Budget Inn hotel. Nonetheless, defendant and Polk continued to contact each other via telephone and text messaging. During the ensuing month of September 2009, defendant regularly visited the Bridges Street apartment to care for the baby while Polk was at work, and he occasionally spent the night in the apartment.

On the night of 30 September 2009, defendant received repeated calls and text messages from Polk while he was at a bar with his father. On the following night, 1 October 2009, Polk and defendant met, talked about their relationship, spent the night together in the Bridges Street apartment, and had consensual sexual relations. Defendant and Polk continued to communicate by telephone and text message over the weekend, 2-4 October 2009.

These legal proceedings commenced when Polk accused defendant of raping her on the night of 4 October 2009. Polk testified that on the evening of 4 October 2009 at around 7:30 p.m., she received a call from defendant asking her if he could stay the night in the Bridges Street apartment. Polk testified that she was grocery shopping when she received defendant's call. She reluctantly agreed to defendant's request and picked him up from a local bar. Polk testified that defendant was very intoxicated, and she and defendant got into an argument during the car ride. She stopped the car and asked defendant to get out of the car. Polk testified she then continued to the Bridges Street apartment where she began to put away the groceries she had just purchased and feed the baby.

Polk testified that defendant then came into the apartment through the unlocked front door, finished feeding the baby, and helped put the baby to bed in the baby's room. She and defendant then sat on the couch in the living room, and the two had an argument about their relationship. Polk testified that she became uncomfortable with defendant's presence and that she attempted to call a neighbor using her cell phone. However, Polk testified that defendant grabbed the cell phone out of her hand and put it in his pocket.

Polk testified that during the argument, defendant became increasingly angry. Polk testified that defendant then went into the kitchen, grabbed a butter knife, held it to her throat, and forced her to undress and lie on the floor in the living room. Polk testified that defendant attempted to have anal intercourse with her but was un-

successful, so defendant repositioned her on the floor and proceeded to have vaginal intercourse with her while holding the butter knife to her throat. Polk testified that after this first incident, she put her clothes back on and sat back on the couch to talk with defendant.

Polk testified that she and defendant began to argue again, during which the baby awoke and began to cry. She picked up the baby out of his bedroom and attempted to escape through a back sliding glass door, but defendant followed her, put a knife to her back, and forced her to come back inside the apartment. Once she was back inside the apartment, Polk laid the baby back down in his room and went into the kitchen, where defendant followed her. Polk testified that defendant then grabbed some more kitchen knives and asked her to play a game with him. Polk testified that defendant tried to slice his wrists with the knives and that he also asked Polk to stab him. Polk testified that she refused to stab defendant, so he told her he would make her angry enough to stab him. Polk testified that defendant then forced her to the floor in the kitchen, again holding a butter knife to her throat, and had vaginal intercourse with her against her will for a second time.

Polk testified that, following the incident in the kitchen, she got up and proceeded to sit in the living room with defendant and talk. Polk testified that during this time, defendant asked her for her car keys, which resulted in a struggle. However, defendant "gave up" trying to take the keys from Polk, and Polk held onto the keys, which contained a full canister of pepper spray. Polk testified that defendant then got up off the couch and went to the bathroom to turn on the water, instructing her that she would take a shower in order to wash off any evidence of the sexual encounters. Polk testified that when defendant came back to put her in the shower, she maced defendant in the face with the pepper spray multiple times. Polk testified that because defendant was blind from the pepper spray, he allowed Polk to leave the apartment with the baby. Polk then ran to a neighbor's apartment and called 911 to report the incident.

Morehead City Police Officer Heather Rose ("Officer Rose") responded to the call around 1:00 a.m. on 5 October 2009. Officer Rose interviewed Polk about the incident and took Polk to a local hospital for a sexual assault kit examination. The examination revealed that Polk had a small tear and redness in the rectal area, accompanied by small scratches and bruises on her left leg, left elbow, and right shoulder. Officer Rose issued arrest warrants for defendant, and defendant was located and arrested shortly thereafter.

Following his arrest, defendant continuously denied the charges, acknowledged he and Polk had vaginal intercourse on the night of 4 October 2009, and contended the sex was part of the couple's normal consensual sexual relationship. Defendant testified he and Polk had consensual sexual relations on both 1-2 October 2009. Defendant testified he then spent the night with another woman named Sarah on 3 October 2009. Cell phone records showed Polk sent at least seven unanswered text messages to defendant before he woke up the next morning.

Defendant testified that he and Polk continued to communicate by text message on 4 October 2009. Defendant testified that on the night of 4 October 2009, Polk came to pick him up from a local bar around 8:30 p.m., and the two got into an argument because he couldn't explain to her the reason for the unanswered phone calls and text messages from the previous night. Defendant testified that he asked Polk to stop the car so he could get out and walk because she was so angry. Defendant testified that upon arriving at the apartment, defendant fed the baby and put the baby to sleep while Polk carried in groceries.

Defendant testified that he and Polk then talked in the living room, where they started to make up and had consensual sexual relations. Defendant testified that he and Polk watched some television then started kissing again, which led to consensual sexual intercourse on the couch. Defendant testified that during the sexual intercourse, he accidentally called Polk by the name of Sarah, to which Polk became extremely angry. Defendant testified that Polk jumped up, started "ranting and raving," said she "ought to call the cops and say [defendant] raped [her]," and maced defendant in the face and eyes when defendant tried to leave. Defendant testified that he saw a cell phone lying on the couch, which he mistakenly thought was his, put the phone in his pocket, and left the apartment. After he left the Bridges Street apartment, defendant went to a nearby friend's house, told her he had had an argument with his girlfriend, and that she had maced him as a result of the argument. Defendant spent the night on his friend's couch, until he was arrested a few hours later.

On 2 November 2009, defendant was indicted for five felony offenses, including two counts of first-degree rape and one count each of first-degree kidnapping, first-degree burglary, and common law robbery. Defendant was tried by jury on 13 September 2010 on all offenses. At the close of trial, the jury returned verdicts finding defendant guilty of three lesser included offenses: second-degree rape, false imprisonment, and misdemeanor larceny. The trial court ordered life-

STATE v. GILLIKIN

[217 N.C. App. 256 (2011)]

time sex offender registration and satellite-based monitoring and sentenced defendant to a minimum of 100 months' imprisonment for the rape charge and four months' imprisonment in each of the two misdemeanor offenses, to run consecutively, for a total of 108 months' minimum imprisonment. Defendant timely appealed to this Court.

## II.  Prejudicial re-instructions to the jury

**[1]**  We first address defendant's argument that he is entitled to a new trial because the trial court's re-instructions to the deadlocked jury did not contain the substance of N.C. Gen. Stat. § 15A-1235(b) and unconstitutionally coerced guilty verdicts in violation of Article I, Section 24 of the North Carolina Constitution. We agree.

In their recent opinion in *State v. Wilson*, 363 N.C. 478, 681 S.E.2d 325 (2009), our Supreme Court announced that "[w]hile the failure to raise a constitutional issue at trial generally waives that issue for appeal, where the error violates the right to a unanimous jury verdict under Article I, Section 24, it is preserved for appeal without any action by counsel." *Id.* at 484, 681 S.E.2d at 330 (citation omitted). This is so because "the right to a unanimous jury verdict is fundamental to our system of justice." *Id.* at 486, 681 S.E.2d at 331. Furthermore, the proper standard of review for an alleged error that violates a defendant's right to a unanimous jury verdict under Article I, Section 24, is harmless error, under which "[t]he State bears the burden of showing that the error was harmless beyond a reasonable doubt." *Id.* at 487, 681 S.E.2d at 331. " 'An error is harmless beyond a reasonable doubt if it did not contribute to the defendant's conviction.' " *Id.* (quoting *State v. Nelson*, 341 N.C. 695, 701, 462 S.E.2d 225, 228 (1995)).

In the present case, the jury began their initial deliberations and continued deliberating for approximately three hours. Following a lunch break, the jury again resumed its deliberations. After another hour of deliberations, the jury sent the following note to the court: "We cannot reach a <u>unanimous</u> decision on 4 of the 5 verdicts." Upon receiving the note, after consultation with defendant's counsel and the State, the trial judge brought the jury back into the courtroom. The trial judge then proceeded to give the following re-instruction:

> ,Jury foreperson], I read your note wherein it says your jury was not able to reach a unanimous verdict on four of the five counts so far. I understand that and I've share[d] that note with the parties.

However, in a case such as this, it's not unusual. It's not unusual, quite frankly, in any case for jurors to have a hard time reaching a unanimous verdict on one charge, much less four or five or more.

So what the Court is prepared to do is remind you—and if you look at the jury instructions—that it is your duty to find the truth in this case and reach a verdict.

What I'm going to do is understand that you guys are having some difficulty back there but most respectfully, direct once again you go back into that jury room, deliberate until you reach a unanimous verdict on all charges. You've not been deliberating that long. I understand it's difficult and I understand sometimes it can be frustrating, but what I ask you to do is continue to be civil, professional, cordial with each other, exchange ideas, continue to deliberate and when you've reached a unanimous verdict, let us know.

Thank you so much. Once again, I ask you [to] retire to your jury room to resume deliberations.

The jury then resumed their deliberations, and after approximately 90 minutes, the jury returned three guilty verdicts.

It has long been the rule in this State that " 'a charge which might reasonably be construed by a juror as requiring him to surrender his well-founded convictions or judgment to the views of the majority is erroneous.' " *State v. Boston*, 191 N.C. App. 637, 644, 663 S.E.2d 886, 891 (2008) (quoting *State v. Alston*, 294 N.C. 577, 593, 243 S.E.2d 354, 364 (1978)). In determining whether a trial court's instructions " 'force a verdict or merely serve as a catalyst for further deliberations,' " our Courts apply a totality-of-the-circumstances test, considering both " 'the circumstances under which the instructions were made and the probable impact of the instructions on the jury.' " *State v. Fernandez*, 346 N.C. 1, 21, 484 S.E.2d 350, 362-63 (1997) (quoting *State v. Peek*, 313 N.C. 266, 271, 328 S.E.2d 249, 253 (1985)).

Section 15A-1235 of the North Carolina General Statutes addresses a trial court's obligations in connection with a deadlocked jury and "is now the proper reference for standards applicable to charges which may be given a jury that is apparently unable to agree upon a verdict." *State v. Easterling*, 300 N.C. 594, 608, 268 S.E.2d 800, 809 (1980). This statute provides in pertinent part:

(a) Before the jury retires for deliberation, the judge must give an instruction which informs the jury that in order to return a verdict, all 12 jurors must agree to a verdict of guilty or not guilty.

(b) Before the jury retires for deliberation, the judge may give an instruction which informs the jury that:

> (1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

> (2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

> (3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

> (4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(c) If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the instructions provided in subsections (a) and (b).

N.C. Gen. Stat. § 15A-1235(a)—(c) (2009).

We acknowledge that the plain language of subsection (c) of this statute is permissive rather than mandatory. *Fernandez*, 346 N.C. at 22, 484 S.E.2d at 363; *see also State v. Aikens*, 342 N.C. 567, 578, 467 S.E.2d 99, 106 (1996). Thus, it is " 'clearly within the sound discretion of the trial judge' " as to whether to re-instruct the jury on subsections (a) and (b) of the statute. *Fernandez*, 346 N.C. at 22, 484 S.E.2d at 363 (quoting *State v. Williams*, 315 N.C. 310, 326-27, 338 S.E.2d 75, 85 (1986)). Nonetheless, " 'whenever the trial judge gives the jury any of the instructions authorized by N.C.G.S. § 15A-1235(b), whether given before the jury initially retires for deliberation or *after the trial judge concludes that the jury is deadlocked*, he *must* give all of them.' " *Id.* at 23, 484 S.E.2d at 364 (emphasis added) (quoting *Williams*, 315 N.C. at 327, 338 S.E.2d at 85). This requirement is satisfied "as long as the trial court gives the substance of the four instructions found in N.C.G.S. § 15A-1235(b)." *Id.* Our Supreme Court has repeatedly em-

phasized that "[c]lear violations of the procedural safeguards contained in G.S. 15A-1235 cannot be lightly tolerated by the appellate division. Indeed, it should be the rule rather than the exception that a disregard of the guidelines established in that statute will require a finding on appeal of prejudicial error." *Easterling*, 300 N.C. at 609, 268 S.E.2d at 809-10; *see also Fernandez*, 346 N.C. at 23, 484 S.E.2d at 364.

In the present case, an examination of both the circumstances under which the re-instructions were given to the jury and the actual language of the re-instructions establishes that the trial judge's re-instructions in this case did not contain the substance of N.C. Gen. Stat. § 15A-1235(b) and, as a result, were coercive. Here, after approximately four hours of deliberations, the jury informed the court that it was deadlocked on four of the five charges against defendant. Thereafter, the trial judge proceeded to re-instruct the jury. The substance of the trial judge's re-instructions to the jury reflects subsection (a) of section 15A-1235, as well as a portion of subsection (b) of section 15A-1235. The trial judge instructed the jury to "exchange ideas," while also instructing the jury to "deliberate until you reach a unanimous verdict on all charges" and to "continue to deliberate and when you've reached a unanimous verdict, let us know." Nowhere in the trial court's re-instructions is there a suggestion to the jurors, as required by subsection (b) of section 15A-1235, that in that exchange of ideas and deliberation with each other, no juror is expected to "surrender his honest conviction" nor reach an agreement that may do "violence to individual judgment."

Indeed, we are unable to distinguish the re-instructions given by the trial judge in the present case from those found to be prejudicial error warranting a new trial in *State v. Roberts*, 270 N.C. 449, 154 S.E.2d 536 (1967). In *Roberts*, the trial court gave the following re-instruction to the jury, which was challenged by the defendant on appeal:

> Now, gentlemen, I instructed you previously the verdict of a jury must be unanimous. That is, all twelve of you must agree to a verdict, and until you do it cannot be accepted as a verdict by the court. For that reason, I am going to have to ask that you deliberate and consider the case further. . . . *I am going to ask that you again retire and consider the case until you reach a unanimous verdict. You may retire for that purpose.*

*Id.* at 451, 154 S.E.2d at 537. In reviewing the charge, our Supreme Court ordered a new trial for the defendant, holding:

The learned trial judge inadvertently failed to instruct the jury that no one of them should surrender his conscientious convictions or his free will and judgment in order to agree with a majority of the jurors upon a verdict. The challenged instruction might reasonably be construed by the member of the jury unwilling to find the defendant guilty as charged as coercive, suggesting to him that he should surrender his well-founded convictions conscientiously held or his own free will and judgment in deference to the views of the majority and concur in what is really a majority verdict rather than a unanimous verdict.

*Id.* at 451, 154 S.E.2d at 537-38.

Here, the trial judge's instruction to "go back into that jury room [and] deliberate until you reach a unanimous verdict on all charges" is substantially the same language as the prejudicial instruction given in *Roberts*. This Court has recently reiterated that such language is "compelling, coercive language." *State v. Smith,* 188 N.C. App. 207, 218, 654 S.E.2d 730, 738 (2008). In addition, like *Roberts* and unlike *Smith,* the trial judge here "altogether failed to instruct the jury that no one was to surrender his personal beliefs in order to agree with a majority on a verdict." *Smith,* 188 N.C. App. at 218, 654 S.E.2d at 738. Accordingly, the trial judge neither gave all of the instructions contained in section 15A-1235(b), despite having given a piece of them, nor relayed the substance of those instructions to the jury. Given our Supreme Court's precedent in *Roberts, Easterling,* and *Fernandez,* we hold the trial judge's re-instructions in the present case are a clear violation of the statutory guidelines, necessitating a finding of prejudicial error.

Moreover, we are unable to see how the error was harmless in the present case. The State contends the error was harmless given the overwhelming evidence of defendant's guilt. However, the evidence against defendant consisted almost entirely of the prosecuting witness's testimony. Likewise, defendant's own testimony is the bulk of the evidence relied on by him to prove his innocence. Thus, the credibility of the two primary witnesses—prosecutrix Polk and defendant—substantially determined this case, necessarily making this a close case for the jury. *See, e.g., State v. Hernendez,* 184 N.C. App. 344, 350, 646 S.E.2d 579, 584 (2007) (finding the credibility of the complaining witness in a rape case to be significant to the underlying case as a whole given the "he said, she said" nature of the case). Given the "he said, she said" nature of this case, we are not persuaded by the State's contention that there was such overwhelming evidence

STATE v. GILLIKIN

[217 N.C. App. 256 (2011)]

against defendant as to render the trial court's error harmless. In light of these circumstances, and given that the jury was deadlocked on four of the five verdicts after nearly four hours of deliberation, we cannot say the trial judge's re-instructions to the jury demanding them to return a unanimous verdict and using such language three separate times without balancing the charge with the substance of the remaining instructions in section 15A-1235(b) did not contribute to the defendant's convictions. Therefore, under the circumstances of this case, we hold the trial judge's re-instructions to the jury were coercive and prejudicial error, entitling defendant to a new trial.

**[2]** Having ordered a new trial for defendant on this issue, we need not address defendant's remaining arguments on appeal. Nonetheless, we take this opportunity to comment on the grossly improper closing argument given by the prosecutor in this case.

In *State v. Jones*, 355 N.C. 117, 558 S.E.2d 97 (2002), our Supreme Court expressly elaborated on the issue of improper closing arguments and the professional obligations of counsel. On this point, our Supreme Court emphasized the following pertinent rules and guidelines for closing arguments:

> "(a) During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record . . . ."

N.C.G.S. § 15A-1230(a) (1999). . . .

> . . . .

> In considering the professional obligation of counsel, we call attention to Rule 12—"Courtroom decorum"—in the General Rules of Practice for the Superior and District Courts, which provides, in pertinent part: "Abusive language or offensive personal references are prohibited," "[t]he conduct of the lawyers before the court and with other lawyers should be characterized by candor and fairness," and "[c]ounsel are at all times to conduct themselves with dignity and propriety." Gen. R. Pract. Super. and Dist. Ct. 12, paras. 7, 8, 2, 2002 Ann. R. N.C. 10. . . . Rule 3.4(e) [of the Rules of Professional Conduct of the North Carolina State Bar] . . . requires that a lawyer shall not,

"in trial, . . . state a personal opinion as to . . . the credibility of a witness, . . . or the guilt or innocence of an accused."

R. Prof. Conduct N.C. St. B. 3.4(e), 2002 Ann. R. N.C. 630.

*Id.* at 127-28, 558 S.E.2d at 104.

In the present case, the prosecutor violated each and every one of the above rules and guidelines. Not only did the prosecutor repeatedly engage in abusive name-calling of defendant and express his opinion that defendant was a liar and was guilty, the entire tenor of the prosecutor's argument was undignified and solely intended to inflame the passions of the jury. Indeed, the trial court recognized the gross improprieties, and we commend the trial court for issuing a curative instruction, *ex mero motu*, to the jury. Had the trial court not issued a curative instruction in this case, we would have been compelled to order a new trial for defendant on this basis as well.

### III. Conclusion

For the foregoing reasons, we hold the trial court's re-instructions to the deadlocked jury did not comply with our statutory guidelines and, given the circumstances of the present case, were coercive and prejudicial error under our Supreme Court's precedent. Accordingly, defendant is entitled to a new trial.

New trial.

Judges HUNTER, JR. and THIGPEN concur.