STATE OF NORTH CAROLINA v. ROBBIE JAMES LYONS

No. 238A94

(Filed 4 April 1996)

**1. Jury § 260 (NCI4th)— peremptory challenges—*Batson* challenge—racially neutral reasons**

The State did not exercise its peremptory challenges to exclude three minority jurors from a prosecution for attempted armed robbery and first-degree murder on the basis of race in violation *Batson v. Kentucky*, 476 U.S. 79, where the prosecutor stated that prospective juror Segers failed to respond to his questions and that he believed that she was not unequivocal in her ability to impose the death penalty; that prospective juror Hairston seemed puzzled, had difficulty understanding questions and the issues of the case, and did not fit the prosecutor's profile of the type of juror he wanted on the jury; and that prospective juror Clavijo was excused due to her lack of roots in the community, coupled with her marital status and short employment history.

**Am Jur 2d, Criminal Law § 684; Jury § 244.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

1

STATE v. LYONS

[343 N.C. 1 (1996)]

Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.

**2. Jury § 260 (NCI4th)— peremptory challenges—factors as totality**

There was no discriminatory intent in the State's use of peremptory challenges to excuse three jurors from a prosecution for attempted armed robbery and first-degree murder where the State accepted some white jurors with the same or similar backgrounds to minority jurors who were excused. Taking a single factor among several articulated by the prosecutor and attempting to match it to a passed juror exhibiting the same factor fails to address the factors as a totality which when considered together provide an image of a juror considered undesirable by the State.

**Am Jur 2d, Criminal Law § 684; Jury § 244.**

Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.

Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.

**3. Jury § 248 (NCI4th)— *Batson* challenge—finding— sufficient**

The trial court's finding on defendant's *Batson* claim in a prosecution for attempted armed robbery and first-degree murder was not deficient because it failed to determine whether defendant had proven purposeful discrimination where the court clearly found that the defendant failed to establish a *Batson* claim and specifically denied the defendant's challenge. Common sense dictates that the trial court determined that the defendant failed in his effort to show purposeful discrimination, even without specifically stating so for the record.

**Am Jur 2d, Criminal Law § 684; Jury § 244.**

Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.

Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.

4. **Evidence and Witnesses § 2239 (NCI4th)— capital sentencing—defendant's writings—use by psychologist—not admissible**

The trial court did not err in a capital sentencing hearing by preventing the jury from considering defendant's writings during its deliberations where defendant's psychologist testified that he had not used defendant's poems and writings to form his opinion as to defendant's specific psychiatric diagnosis, but that the writings lent a great deal of understanding to the life of defendant and were part of the ultimate opinion to which he testified. The trial court properly ruled that defense counsel could question the psychologist about the content of the writings provided they formed the specific basis for his opinion; however, the psychologist clearly testified that he had not used the writings to form his opinion as to the defendant's specific psychiatric diagnosis and the record is devoid of any evidence tending to show that these writings were actually written by the defendant.

**Am Jur 2d, Evidence § 1499; Expert and Opinion Evidence §§ 168, 173, 182.**

**Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case. 17 ALR3d 146.**

5. **Criminal Law § 1360 (NCI4th)— capital sentencing—mitigating circumstances—impaired capacity—specific symptoms required**

The trial court did not err in a capital sentencing hearing by not submitting the statutory mitigating circumstance that the capacity of defendant to conform his conduct to the requirements of the law was impaired where defendant's psychologist testified about bipolar disorder, antisocial personality disorder and substance abuse, but did not testify that defendant himself was subject to an inability to conform or impairment in conforming his conduct to the requirements of the law at the time he murdered his victim. It is not enough for a defense expert to proffer in general a definition of a disorder without any testimony as to the specific symptoms from which a particular defendant suffers.

**Am Jur 2d, Evidence § 1499; Expert and Opinion Evidence §§ 168, 173, 190; Trial §§ 835, 1270, 1271, 1278, 1285.**

STATE v. LYONS

[343 N.C. 1 (1996)]

Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case. 17 ALR3d 146.

Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.

6. **Criminal Law § 682 (NCI4th)— capital sentencing— peremptory instructions—mental or emotional disturbance**

The trial court did not err in a capital sentencing hearing by refusing defendant's request for a peremptory instruction on the statutory mitigating circumstance that the offense was committed while the defendant was under the influence of a mental or emotional disturbance. The only evidence offered by defendant to support the submission of this mitigating circumstance was the testimony of defendant's psychologist, which revealed that defendant suffered from bipolar disorder and antisocial personality disorder, but there was no evidence in the record that defendant was under the influence of either disorder at the time the offense was committed.

Am Jur 2d, Evidence § 1499; Expert and Opinion Evidence §§ 168, 173, 190; Trial §§ 835, 1270, 1271, 1278, 1285.

Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case. 17 ALR3d 146.

Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.

7. **Evidence and Witnesses § 2171 (NCI4th)— capital sentencing hearing—defense psychologist—cross-examination—prior incarceration in S.C.**

The trial court did not err in a capital sentencing hearing by permitting the prosecutor to cross-examine defendant's psychologist regarding defendant's prior incarceration in South Carolina where the psychologist had used records from the South Carolina Department of Corrections as a basis for formulating his opinions. N.C.G.S. § 8C-1, Rule 705.

Am Jur 2d, Trial § 626.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other

STATE v. LYONS

[343 N.C. 1 (1996)]

violent offense, had history of violent conduct, posed con-
tinuing threat to society, and the like—post-*Gregg* cases.
65 ALR4th 838.

8. **Criminal Law § 1329 (NCI4th)— capital sentencing—Issue
Four—outcome determinative—unanimity**

The trial court did not err by instructing the jury that it must
unanimously agree on its answer to Issue Four on the Issues and
Recommendation as to Punishment form. Any issue which is out-
come determinative as to the sentence a defendant in a capital
trial will receive must be answered unanimously by the jury;
issues one, three, and four are outcome determinative.

**Am Jur 2d, Trial §§ 1437, 1759.**

**Unanimity as to punishment in criminal case where jury
can recommend lesser penalty. 1 ALR3d 1461.**

9. **Criminal Law § 877 (NCI4th)— jury deliberations—jury
not deadlocked—incomplete instructions on necessity of
verdict**

There was no plain error in a capital sentencing proceeding
where defendant contended that the trial court unduly empha-
sized the necessity for a verdict by its omission of subsections (2)
and (3) of N.C.G.S. § 15A-1235(b), but the jury never indicated
that it was deadlocked or that it was having difficulty reaching a
unanimous decision. It has been held that it is not error for the
trial court to give less than the full instruction set out in N.C.G.S.
§ 15A-1235 when the jury does not indicate that it is deadlocked
or having difficulty reaching a unanimous verdict. The instruction
given conveyed the essence of N.C.G.S. § 15A-1235(b) and it is
clear that the instruction could not have had a prejudicial impact.

**Am Jur 2d, Trial § 1458.**

**Time jury may be kept together on disagreement in
criminal case. 93 ALR2d 627.**

10. **Criminal Law § 1337 (NCI4th)— capital sentencing—aggra-
vating circumstances—previous conviction involving vio-
lence—sequence of convictions**

The trial court did not err in a capital sentencing hearing by
instructing the jury to consider in support of the aggravating cir-
cumstance that defendant had previously been convicted of a
felony involving the use or threat of violence an armed robbery

STATE v. LYONS

[343 N.C. 1 (1996)]

committed on 2 April 1993 where he committed the present murder on 25 September 1993, he was convicted of the armed robbery on 6 October 1993, and his murder trial began on 24 April 1994. So long as the prior violent felony occurred before the date the capital defendant committed murder and the capital defendant is convicted of the violent felony at some point prior to the capital trial, then compliance with N.C.G.S. §. 15A-2000(e)(3) has been achieved.

**Am Jur 2d, Trial § 841.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

11. **Jury § 141 (NCI4th)— first-degree murder—voir dire— parole eligibility**

The trial court did not err in a first-degree murder prosecution by denying defendant's request to question prospective jurors regarding their conceptions of parole eligibility.

**Am Jur 2d, Jury §§ 193, 194.**

**Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.**

**Prejudicial effect of statement of prosecutor as to possibility of pardon or parole. 16 ALR3d 1137.**

12. **Criminal Law § 1326 (NCI4th)— first-degree murder—mitigating circumstances—defendant's burden—instructions—use of "satisfaction" and "satisfy"**

The trial court did not err in a capital sentencing hearing by using the terms "satisfaction" and "satisfy" to instruct the jury as to the defendant's burden of proof applicable to mitigating circumstances.

**Am Jur 2d, Trial §§ 841, 1291.**

**Supreme Court's views as to prejudicial effect in criminal case of erroneous instructions to jury involving burden of proof or presumptions. 92 L. Ed. 2d 862.**

STATE v. LYONS

[343 N.C. 1 (1996)]

**13. Criminal Law § 1363 (NCI4th)— capital sentencing— instructions—nonstatutory mitigating circumstances— value**

The trial court did not err in a first-degree murder prosecution by instructing the jurors that they could reject evidence of mitigation as to nonstatutory mitigating circumstances on the basis that the evidence had no mitigating value.

**Am Jur 2d, Trial §§ 841, 1291.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

**14. Jury § 226 (NCI4th)— first-degree murder—death qualification—rehabilitation**

The trial court did not err in a first-degree murder prosecution by denying defendant the right to examine each juror challenged by the State during death qualification prior to his or her excusal for cause.

**Am Jur 2d, Jury §§ 226, 228-233.**

**15. Criminal Law § 1329 (NCI4th)— capital sentencing— instructions—Issues Three and Four**

The trial court did not err in a first-degree murder prosecution in its instruction on Issues Three and Four on the Issues and Recommendation as to Punishment form.

**Am Jur 2d, Trial § 1441.**

**16. Jury § 103 (NCI4th)— first-degree murder—individual voir dire—denied**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion for individual *voir dire*.

**Am Jur 2d, Jury §§ 193, 194, 198.**

**17. Jury § 93 (NCI4th)— first-degree murder—voir dire**

The trial court did not err in a first-degree murder prosecution by restricting defendant's *voir dire*; control of jury selection rests within the sound discretion of the trial court.

**Am Jur 2d, Jury §§ 193, 194, 202.**

**18. Criminal Law § 415 (NCI4th)— first-degree murder—prosecutor's arguments**

The trial court did not err during a first-degree murder prosecution by not intervening *ex mero motu* to prevent five generalized instances of alleged improper arguments made by the prosecutor during closing arguments.

**Am Jur 2d, Trial §§ 491, 493, 496.**

**Prejudicial effect of trial court's denial, or equivalent, of counsel's right to argue case. 38 ALR2d 1396.**

**19. Criminal Law § 1373 (NCI4th)— death penalty—not disproportionate**

A sentence of death for first-degree murder was not excessive or disproportionate where the record fully supports the aggravating circumstance found by the jury, there is no indication that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, each case where the North Carolina Supreme Court has found a sentence of death disproportionate is distinguishable from this case, this case is more similar to certain cases in which the death sentence has been found proportionate than those in which the court has found the death sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment, and, based on the nature of the crime, it cannot be concluded as a matter of law that the jury's recommendation was excessive or disproportionate.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

Justice WHICHARD concurring.

Justice FRYE joins in this concurring opinion.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Freeman, J., at the 25 April 1994 Criminal Session of Superior Court, Forsyth County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 14 November 1995.

STATE v. LYONS

[343 N.C. 1 (1996)]

*Michael F. Easley, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 31 January 1994 for attempted robbery with a dangerous weapon and for the first-degree murder of Stephen Wilson Stafford. The defendant was tried capitally, and the jury found the defendant guilty of attempted robbery with a dangerous weapon and guilty of first-degree felony murder. Following a capital sentencing hearing pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to death. For the reasons discussed herein, we conclude that the jury selection and the guilt/innocence and sentencing phases of defendant's trial were free from prejudicial error, and that the sentence of death is not disproportionate.

Stephen Stafford, the victim, owned a small business known as Sam's Curb Market (hereinafter referred to as "Sam's") in Winston-Salem, North Carolina. At trial, the State presented evidence tending to show that on 25 September 1993, Stafford was shot and killed in his place of business. Victoria Lytle witnessed the shooting.

Lytle testified that early in the afternoon of 25 September 1993, she drove to Sam's and parked directly in front of the market. As Lytle got out of her car, she noticed two men across the street. Lytle went into the store, collected her purchases, and then remembered that she needed some diet soda. Lytle went to the store's cooler. At that time, one of the men, Derick Hall, entered the store. As Lytle approached the counter, Hall told her to go ahead of him and pay for her items, but Lytle told him to go ahead of her instead. While waiting for Hall to pay for his purchases, Lytle noticed the defendant standing outside and looking into the store. Lytle then paid for her purchases, said goodbye to the victim and left the store.

Lytle further testified that she heard three gunshots as she closed her car door. At the time the shots were fired, Lytle was approximately three feet from the store. Lytle stated that upon hearing the shots she looked up and saw a flash. She then heard the victim moan and saw him fall forward over the counter and then backward to the floor. Lytle testified that immediately after she heard the shots and

saw the victim fall, she saw the defendant run out of the store with a gun in his hand.

Derick Hall, the defendant's accomplice, testified for the State that he had a long-barreled .22-caliber gun on the morning of Mr. Stafford's murder. Hall stated that when he and the defendant went to Sam's, the defendant had possession of the gun. Hall testified that as he and the defendant approached Sam's, the defendant told him that he needed money and was going to rob the store. Hall did not believe the defendant was serious. After Victoria Lytle left the store, the defendant entered and told the victim to freeze and turn around. Hall also obeyed the command in order to demonstrate that he had no part in the robbery. Hall testified that he then heard five shots, and when he turned around, the defendant was gone and the victim was lying on the floor. Hall further testified that the victim was grunting in an effort to speak and that the victim reached up and pushed the burglar alarm before collapsing back on the floor. The next evening, Hall voluntarily turned himself in to the police.

Dr. Patrick Lantz, a forensic pathologist, performed an autopsy on the victim's body on 26 September 1993. Dr. Lantz testified that one bullet entered the victim's left hand and was recovered from the victim's wrist. This wound was consistent with the victim's having grasped the gun and would not in itself have been fatal. Two more bullet fragments were discovered in the victim's upper arm. These bullet fragments fractured the humerus and caused considerable splintering of the bone. This wound would similarly not have been fatal in the short term. Finally, Dr. Lantz testified that the victim had been shot in the back and that bullet went into the victim's chest through the lung and aorta. Dr. Lantz testified that this bullet wound caused the victim to bleed to death.

Special Agent Ronald Marrs, an expert in the field of firearms identification, testified that two of the bullets recovered from the victim's body were .22-caliber. The two fragments were too deformed to yield a result. Although made by different manufacturers, the bullets were all consistent with having been fired from a .22-caliber weapon.

The defendant offered no evidence during the guilt/innocence phase of the trial.

At the penalty phase of the trial, the State presented evidence supporting the submission of the aggravating circumstance that the defendant had previously been convicted of a felony involving the use

**STATE v. LYONS**

[343 N.C. 1 (1996)]

or threat of violence to the person. This evidence tended to show that the defendant had been convicted of two prior felonies, one of which was an armed robbery, and one of which was a common law robbery.

The defendant's evidence consisted of testimony from Dr. Gary Hoover, an expert in the field of psychology. Dr. Hoover testified that he conducted a forensic psychological evaluation of the defendant which included interviews with eleven individuals and records from nine sources covering defendant's history as far back as age eight. Dr. Hoover also interviewed the defendant twice at Central Prison. Dr. Hoover diagnosed defendant as suffering from bipolar disorder, anti-social personality disorder and substance abuse.

## JURY SELECTION/GUILT PHASE

[1] In his first assignment of error, the only issue in the guilt/innocence phase of the trial not treated as a preservation issue, the defendant contends that the State exercised its peremptory challenges to exclude three minority jurors on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the use of peremptory challenges to exclude a juror solely on account of his or her race. *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83. The Supreme Court established a three-part test to determine if a prosecutor has impermissibly excluded a juror based on race. First, *the defendant must* establish a *prima facie* case of purposeful discrimination. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88; *State v. Robinson*, 330 N.C. 1, 15, 409 S.E.2d 288, 296 (1991). If the defendant succeeds in establishing a *prima facie* case of discrimination, the burden shifts to the prosecutor to offer a race-neutral explanation for each challenged strike. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88; *State v. Wiggins*, 334 N.C. 18, 31, 431 S.E.2d 755, 763 (1993). Finally, the trial court must determine whether the defendant has proven purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991).

In the case *sub judice*, the prosecutor, at the trial court's request, offered race-neutral explanations for each peremptory challenge to which the defendant objected. Because the purpose of the *prima facie* case is to shift the burden of going forward to the State, the State's offer of race-neutral explanations renders it unnecessary to address whether the defendant met his initial burden of establishing

a *prima facie* case of discrimination. *Id.* We proceed, therefore, as if the *prima facie* case had been established and turn our attention to the State's reasons for peremptorily challenging prospective jurors Segers, Hairston and Clavijo.

With regard to prospective juror Segers, the prosecutor provided the following explanation:

> Judge, we felt that Ms. Segers in her response to the death penalty questions, she stated that the death penalty was simply an option and that [we] felt that she was not absolutely unequivocal on her ability to impose the death penalty. That she leaned her body language that she was leaning away from the entire jury selection process. . . . [H]er body language was the worst of any of the jurors as she was leaning away trying to get as far away from the table as possible.

> Then she had no responses to the group questions when we would ask questions of the group. That she would just remain silent and not participate in the selection.

With regard to prospective juror Hairston, the prosecutor explained:

> Your Honor, we noted that on Ms. Hairston's juror question-naire that she was . . . a nurse. That . . . we did not want those folks with an absolute nurturing type of personality. We also note that she didn't understand on literally every question that we asked that all other eleven jurors answered almost immediately [and] she was evasive in her answers. She had difficulty following the questions and that she repeatedly asked me to repeat the questions. That at the first time that I talked about whether one could sign their name on the death penalty verdict, she looked shocked . . . .

> That when we tried to explain things to her, she looked puz-zled and she couldn't apparently understand when I talked about some of the issues that some of the other jurors were able to grasp.

Finally, with regard to prospective juror Clavijo, the prosecutor explained:

> Judge, we felt that she—on her questionnaire she put that she had only been employed for four months and that she had only lived in this county for four months. That she was single. That she

had not voted in an election since 1989. We felt that she didn't have a sufficient stake in the community to warrant for the State sitting on a death penalty case.

In order to rebut a *prima facie* case of discrimination, the prosecution must articulate legitimate reasons which are clear, reasonable and related to the particular case to be tried. *State v. Jackson*, 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). The prosecutor's explanation need not, however, rise to the level justifying a challenge for cause. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88. Furthermore, if not racially motivated, the prosecutor may exercise peremptory challenges on the basis of legitimate hunches and past experience. *Robinson*, 330 N.C. at 17, 409 S.E.2d at 297.

The prosecutor stated that prospective juror Segers failed to respond to his questions and that he believed that she was not unequivocal in her ability to impose the death penalty. The prosecutor stated that prospective juror Hairston seemed puzzled and had difficulty understanding his questions and the issues of the case. Moreover, prospective juror Hairston did not fit the prosecutor's profile of the type of juror he wanted on the jury. The prosecutor stated that prospective juror Clavijo was excused due to her lack of roots in the community, coupled with her marital status and short employment history. Although none of these reasons would justify an excusal for cause, each reason is clear, reasonably specific and related to the particular case to be tried. The prosecutor is not required to provide an explanation that is persuasive, or even plausible. *Purkett v. Elem*, —— U.S. ——, ——, 131 L. Ed. 2d 834, 839 (1995). "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406.

[2] The defendant argues that discriminatory intent is shown by the fact that the State accepted some white jurors with the same or similar backgrounds to minority jurors who were excluded. For example, the defendant argues that the State accepted three jurors who were nurses yet excused prospective juror Hairston presumably because she was a nurse. Although it is proper for the trial court to consider whether similarly situated white veniremen are accepted as jurors, the defendant in this case takes a single factor among several articulated by the prosecutor and attempts to match it to a passed juror

exhibiting the same factor. This approach "fails to address the factors as a totality which when considered together provide an image of a juror considered . . . undesirable by the State." *State v. Porter*, 326 N.C. 489, 501, 391 S.E.2d 144, 152 (1990). When considered in this light, we believe that the State has met its burden of coming forward with neutral, nonracial explanations for each peremptory challenge.

[3] Finally, the defendant argues that the trial court's finding was deficient because it failed to determine whether the defendant had proven purposeful discrimination, the third step in a *Batson* challenge. We disagree. Following the prosecutor's explanations, the trial court made the following finding:

> Well, the Court will find that based on the questions asked and the jurors interviewed, the defendant has failed to establish a *prima facie* pattern of discriminatory use of challenges on behalf of the district attorney but out of an abundance of caution the Court has asked the district attorney to articulate reasons and the district attorney has articulated valid reasonable and satisfactory reasons for his use of challenges which are totally aside from race and the Court will deny the challenge under *Batson*.

The trial court clearly found that the defendant failed to establish a *Batson* claim and specifically denied the defendant's challenge. Common sense, therefore, dictates that the trial court determined that the defendant failed in his effort to show purposeful discrimination, even without specifically stating so for the record. This assignment of error is therefore overruled.

### SENTENCING PHASE

[4] In his next assignment of error, the defendant contends that the trial court deprived him of his constitutional right to produce relevant mitigating evidence under the Eighth Amendment to the United States Constitution and the United States Supreme Court's opinion in *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978). Specifically, the defendant argues that the trial court erred by preventing the jury from considering writings of the defendant during its deliberations in the sentencing phase of the trial.

At the sentencing phase, defendant called Dr. Gary Hoover, a psychologist, to the stand. Defense counsel asked Dr. Hoover to identify a series of poems and writings allegedly written by the defendant. After the State objected to the admission of these writings, defense counsel attempted, with the trial court's permission, to lay a founda-

tion for their introduction. Dr. Hoover testified that he had not used the writings to form his opinion as to the defendant's specific psychiatric diagnoses, but that the writings lent "a great deal of understanding to the life of [the defendant]" and were part of the "ultimate" opinion to which he had testified. The trial court decided to allow the writings into evidence but would not permit them to be read to or passed to the jury, or used during closing arguments. The trial court did specifically rule, however, that if Dr. Hoover had used some part of the writings as a specific basis for his opinion, then defense counsel could present that to the jury.

We conclude that the defendant has not been deprived of any constitutional rights by this ruling. The trial court properly ruled that defense counsel could question Dr. Hoover about the content of the writings provided they formed the specific basis for his opinion. Defense counsel chose not to do so for good reason. Dr. Hoover testified that the defendant's writings were helpful to him in understanding the defendant's life and forming his "ultimate" opinion. However, Dr. Hoover also clearly testified that he had not used the writings to form his opinion as to the defendant's specific psychiatric diagnoses. The record fails to show any instance in which Dr. Hoover offered an "ultimate" opinion other than or different from the specific diagnoses of bipolar disorder and antisocial personality disorder.

Furthermore, a careful review of the record reveals that the writings were neither pertinent nor dependable as required by this Court's decision in *State v. Rose*, 339 N.C. 172, 200, 451 S.E.2d 211, 227 (1994), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 818 (1995). The writings were either unsigned or signed by someone using the name "Lord Insane." Dr. Hoover did not testify in what context he saw the writings or under what circumstances he was given the writings. Moreover, Dr. Hoover never testified as to how he knew that the writings were actually defendant's. The record is simply devoid of any evidence tending to show that these writings were actually written by the defendant. Accordingly, this assignment of error is overruled.

[5] In his third assignment of error, the defendant contends that the trial court erred by failing to submit the statutory mitigating circumstance that "[t]he capacity of the defendant . . . to conform his conduct to the requirements of the law was impaired." N.C.G.S. § 15A-2000(f)(6) (Supp. 1995).

The defendant's psychologist, Dr. Hoover, testified that the defendant suffered from bipolar disorder, antisocial personality dis-

order and substance abuse. With regard to antisocial personality disorder, Dr. Hoover testified as follows:

> Essentially the anti-social personality disorder exists in an individual who is unable to conform his or her behavior to societies' expectations and they behave in an anti-social and often illegal ways. The term "anti-social" itself does not necessarily connote illegal behavior but often we find with anti-social personalities that they do engage in illegal behavior. The term "anti-social" simply means that the individual is not able to conform their behavior to the general expectations of society . . . .

Dr. Hoover's testimony is the only evidence which defendant contends supports the submission of the (f)(6) mitigator.

A close reading of Dr. Hoover's testimony, however, reveals that when asked about the defendant's antisocial personality disorder, Dr. Hoover responded by describing only its general symptoms. Dr. Hoover spoke of the disorder "in an individual" affecting "his or her" ability to conform. Dr. Hoover went on to say of these individuals that "they" behave in antisocial ways. Dr. Hoover never testified that *the defendant* was unable to conform his conduct to the requirements of the law or that the defendant was suffering from antisocial personality disorder *at the time of the murder*. In other words, it is apparent that Dr. Hoover did not testify that the defendant himself was subject to an inability to conform or impairment in conforming his conduct to the requirements of the law at the time he murdered the victim. It is not enough for a defense expert to proffer in general a definition of a disorder without any testimony as to the specific symptoms from which a particular defendant suffers. We therefore find no error in the trial court's failure to submit the (f)(6) mitigating circumstance. This assignment of error is overruled.

[6] In his fourth assignment of error, the defendant contends that the trial court erred by refusing the defendant's request for a peremptory instruction on the statutory mitigating circumstance that the offense was committed while the defendant was under the influence of a mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2).

A capital defendant is entitled to a peremptory instruction when a mitigating circumstance is supported by uncontradicted evidence. *State v. Johnson*, 298 N.C. 47, 76, 257 S.E.2d 597, 618 (1979). A peremptory instruction tells the jury to answer the inquiry in the manner indicated by the trial court *if it finds* that the fact exists as all the

evidence tends to show. *Id.* at 75, 257 S.E.2d at 617. However, even where all of the evidence supports a finding that the mitigating circumstance exists and a peremptory instruction is given, the jury is still free to reject the circumstance if it does not find the evidence credible or convincing. *State v. Rouse,* 339 N.C. 59, 107, 451 S.E.2d 543, 570 (1994), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 60 (1995).

In the case *sub judice,* Dr. Hoover's testimony is the only evidence offered by the defendant to support the submission of this mitigating circumstance. However, Dr. Hoover did not testify that the defendant was under the influence of either bipolar disorder or antisocial personality disorder at the time of the murder. Dr. Hoover's uncontradicted testimony merely revealed that the defendant suffered from bipolar disorder and from antisocial personality disorder. There is simply no evidence in the record that the defendant was under the influence of either disorder at the time the offense was committed. Therefore, the submission of a peremptory instruction was not required, and we find no error in the trial court's failure to so instruct. This assignment of error is overruled.

[7] In his fifth assignment of error, the defendant contends that the trial court erred by permitting the prosecutor to cross-examine Dr. Hoover regarding the defendant's prior incarceration in South Carolina.

During the prosecutor's cross-examination of Dr. Hoover, the following exchange took place:

Q. What other records did you receive?

A. South Carolina Department of Corrections.

Q. Okay. And about what age are we talking about on those?

A. Same time span.

Q. Twenty to twenty-two?

A. Yes. That age range.

Q. Did those records indicate that he spent any time in South Carolina Department of Corrections?

A. Yes. They do.

Q. Did you use those records as a basis for formulating some of your theories and your opinion here today?

A. Yes.

Q. So you're well aware of his run-ins with the law down there in South Carolina?

A. Yes. I am.

. . . .

Q. Are you familiar with the attack on the prison guard down there?

A. Yes, sir.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q. Are you familiar with the prison—the attack on the prison guard down there?

A. Yes. Yes, I am.

Q. And you're familiar with the incident when he was able to take a—some type of an item or handmade knife and push it through a riot shield during a disturbance down there in the South Carolina Department of Corrections?

[DEFENSE COUNSEL]: Objection.

THE COURT: I'll sustain that.

Q. Are you familiar with his criminal record down there involving the assault on the officer down there?

[DEFENSE COUNSEL]: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Yes.

Defendant specifically argues that the trial court should have sustained his objections because evidence of the assault on the prison guard was not elicited by the State for impeachment purposes or to counter mitigating evidence. Instead, the defendant argues that the evidence was used as a *de facto* aggravating circumstance by persuading the jury that the defendant would be a dangerous prisoner if given a life sentence. We conclude that the prosecutor properly questioned the defendant's expert witness regarding the underlying data used to form his opinions.

STATE v. LYONS

[343 N.C. 1 (1996)]

Rule 705 of the North Carolina Rules of Evidence provides in pertinent part:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire before stating the opinion. *The expert may in any event be required to disclose the underlying facts or data on cross examination.*

N.C.G.S. § 8C-1, Rule 705 (1992) (emphasis added).

In the case *sub judice,* Dr. Hoover testified on direct examination that he had obtained records from nine sources as part of his forensic psychological evaluation of the defendant. Dr. Hoover also testified that symptoms of the defendant's bipolar disorder included episodic run-ins with the law. On cross-examination, Dr. Hoover testified that he used records from the South Carolina Department of Corrections as a basis for formulating his opinions. Evidence regarding defendant's behavior while incarcerated in South Carolina was contained in those records. Therefore, pursuant to Rule 705, it was proper for the prosecutor, during cross-examination, to question Dr. Hoover regarding those records, as they were used to formulate his opinion that defendant was suffering from bipolar disorder. The trial court's rulings were in all respects proper. This assignment of error is accordingly overruled.

[8] In his sixth assignment of error, the defendant argues that the trial court erred by instructing the jury that it must unanimously agree on its answer to Issue Four on the "Issues and Recommendation as to Punishment" form.

This Court has recently addressed the issue of unanimity as to Issues Three and Four in *State v. McCarver,* 341 N.C. 364, 462 S.E.2d 25 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 482, (1996). In *McCarver,* this Court held that "any issue which is outcome determinative as to the sentence a defendant in a capital trial will receive . . . must be answered unanimously by the jury." *Id.* at 390, 462 S.E.2d at 39. Issues One, Three and Four are outcome determinative. *Id.* Accordingly, we conclude that the trial court did not err by instructing the jury that it must be unanimous in its answer on Issue Four of the "Issues and Recommendation as to Punishment" form.

**[9]** In a related assignment of error, the defendant contends that the trial court unduly emphasized the necessity for a verdict by its failure to properly instruct the jury in accord with N.C.G.S. § 15A-1235(b). Section 15A-1235(b) provides:

> Before the jury retires for deliberation, the judge may give an instruction which informs the jury that:
>
> (1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
>
> (2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;
>
> (3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and
>
> (4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

N.C.G.S. § 15A-1235(b) (1988).

In the case *sub judice*, the following exchange occurred after the jury questioned the trial court regarding the necessity of a unanimous response to Issue Four on the "Issues and Recommendation as to Punishment" form:

> THE COURT: Now let me ask you, I assume—are you making progress now or do you feel like—you don't feel like you're hopelessly —
>
> FOREMAN: —I think that all of us are to a point that, you know, we just need to go back but I think everybody's mind is pretty close to the final decision factor.
>
> THE COURT: So you are still deliberating and discussing it and moving forward?
>
> FOREMAN: We have been up until this point.
>
> THE COURT: Let me say a few things to you that you probably have heard before and then I'll let you go back.

STATE v. LYONS

[343 N.C. 1 (1996)]

I want to emphasize the fact to you that it is your duty to do whatever you can to reach a verdict. You should reason the matter over together as reasonable men and women and to reconcile your differences if you can without the surrender of conscientious convictions. However, no juror should surrender his or her honest conviction as to the weight or the effect of the evidence solely because of the opinion of his or her fellow jurors or for the mere purpose of returning a verdict. So I will let you resume your deliberations at this time. If you will, step back and see if you can reach a verdict, please.

Relying on *State v. Williams*, 315 N.C. 310, 338 S.E.2d 75 (1986), the defendant argues that the trial court committed reversible error by omitting the substance of subsections (2) and (3) of N.C.G.S. § 15A-1235(b). In *Williams*, this Court stated that when a trial court concludes that a jury may be deadlocked and gives any of the instructions included in N.C.G.S. § 15A-1235(b), the trial court must give all of the instructions listed. *Id.* at 327, 338 S.E.2d at 85.

We find no error in the trial court's paraphrase of this instruction. In *Williams*, the jury specifically announced to the trial court that the jury was unable to reach a verdict. Under such circumstances, it was error not to give the full instruction set out in N.C.G.S. § 15A-1235. *Id.* Here, however, the jury never indicated that it was deadlocked or that it was having difficulty reaching a unanimous decision. The jury foreman stated that the jury was "pretty close" to a final decision and that up until its break for the question regarding Issue Four, the jury was discussing the issues and moving forward. This Court has held that it is not error for the trial court to give less than the full instruction set out in N.C.G.S. § 15A-1235 when the jury does not indicate that it is deadlocked or having difficulty reaching a unanimous verdict. *State v. Williams*, 339 N.C. 1, 39-40, 452 S.E.2d 245, 268 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 61 (1995).

Furthermore, we note that the defendant failed to object to the trial court's instruction. Our review is therefore limited to a determination of whether the omission constituted "plain error." Assuming, *arguendo*, that the trial court erred, we cannot say that the error was so fundamental or prejudicial that it amounted to plain error. The trial court instructed the jurors that they had a duty to "reason the matter over together as reasonable men and women" to reach a verdict, but only if it could be done *without the surrender of each juror's honest convictions*. This portion of the trial court's instruction conveyed to

the jurors that they were not to sacrifice their individual beliefs in order to reach a verdict. In other words, the instruction conveyed the essence of N.C.G.S. § 15A-1235(b). It is clear, therefore, that the instruction could not have had a prejudicial impact. This assignment of error is overruled.

[10] In his last assignment of error, the defendant contends that the trial court erred by instructing the jury to consider a conviction, which occurred after the commission of this offense, as evidence supporting the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance.

The sole aggravating circumstance submitted to the jury in the case *sub judice* was whether the defendant "had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3). The prosecutor submitted two prior felony convictions, one of which was an armed robbery, in support of this aggravating circumstance. Defendant committed the armed robbery on 2 April 1993. Defendant committed the present murder on 25 September 1993. Defendant was convicted of the armed robbery on 6 October 1993. The defendant's trial for the murder of Mr. Stafford began on 25 April 1994. Defendant argues that because the conviction for armed robbery was entered eleven days after he murdered the victim in this case, it was inadmissible as support for the (e)(3) aggravating circumstance. Defendant insists that the legislature's concern was with the date of conviction, not the date of the crime itself.

In *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979), this Court held that the "previously convicted" language used by the legislature in subsection (e)(3) refers to criminal activity conducted prior to the events out of which the charge of murder arose. *Id.* at 23, 257 S.E.2d at 584. The emphasis is on the date of the prior violent felony, not the date of conviction. Therefore, it is our holding that so long as the prior violent felony occurred before the date the capital defendant committed murder and the capital defendant is convicted of the violent felony at some point prior to the capital trial, then compliance with the terms of subsection (e)(3) has been achieved. We accordingly overrule defendant's assignment of error.

PRESERVATION ISSUES

[11-15] The defendant raises five issues which he concedes have been decided against him by this Court: (1) the trial court erred by denying defendant's request to question prospective jurors regarding their conceptions of parole eligibility, (2) the trial court erred by

using the inherently ambiguous terms "satisfaction" and "satisfy" to instruct the jury as to the defendant's burden of proof applicable to mitigating circumstances, (3) the trial court erred by instructing the jurors that they could reject evidence of mitigation as to nonstatutory mitigating circumstances on the basis that the evidence had no mitigating value, (4) the trial court erred by denying the defendant the right to examine each juror challenged by the State during death qualification prior to his or her excusal for cause, and (5) the trial court erred in its instruction regarding Issues Three and Four on the "Issues and Recommendation as to Punishment" form. We have considered the defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule each of these assignments of error.

The defendant raises three additional issues which are not conceded but which defendant nevertheless treats as preservation issues.

[16,17] First, the defendant argues that the trial court erred by denying defendant's motion for individual *voir dire*. Second, the defendant argues that the trial court erred by restricting his ability to conduct an adequate jury *voir dire*. Defendant recognizes that control of jury selection rests within the sound discretion of the trial court. *See State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 895 (1995). We have reviewed defendant's arguments and find no compelling reason to overrule the trial court's rulings. Each of these assignments of error is overruled.

[18] Finally, the defendant argues that the trial court erred by not intervening *ex mero motu* to prevent five generalized instances of alleged improper arguments made by the prosecutor during closing arguments in the penalty phase of trial. The defendant cites no authority in support of his position. We note that this Court has routinely allowed prosecutors wide latitude during their closing arguments. *See State v. Moseley*, 338 N.C. 1, 449 S.E.2d 412 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 738 (1995). We have reviewed each asserted instance of improper argument and find no basis to conclude that the trial court erred by not intervening *ex mero motu*. This assignment of error is overruled.

We also note that the defendant raises fifty-nine additional assignments of error in his *pro se* supplemental brief. With two exceptions, this brief is merely a restatement of the original assignments of error contained in the record on appeal. Each "issue" is presented without argument or supporting authority. Furthermore, defendant is appar-

ently unaware that many of these additional "issues" have already been argued in the brief filed by his appellate counsel. Nevertheless, we have reviewed each of the additional issues that have not already been addressed and find them to be without merit. Therefore, we overrule these assignments of error as well.

### PROPORTIONALITY REVIEW

[19] Having found no error in either the guilt/innocence or sentencing phase, we are required by statute to review the record and determine (1) whether the evidence supports the aggravating circumstance found by the jury; (2) whether passion, prejudice or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). After thoroughly reviewing the record, transcript and briefs in the present case, we conclude that the record fully supports the aggravating circumstance found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We defined the pool of cases for proportionality review in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), and we compare the instant case to others in the pool that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994).

In the case *sub judice*, the jury found the defendant guilty of first-degree murder under the theory of felony murder. The jury found as

an aggravating circumstance that the defendant "had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3). The jury found one statutory mitigating circumstance, that the offense was "committed while defendant was mentally or emotionally disturbed." N.C.G.S. § 15A-2000(f)(2). The jury also found as nonstatutory mitigating circumstances that (1) the defendant was emotionally abused as a child, (2) the defendant was abandoned by his mother as a child, (3) the defendant's current psychological disorders are related to his mother's abuse of drugs, and (4) the defendant has a long history of alcohol and drug abuse. The jury also found the statutory catchall mitigating circumstance. N.C.G.S. § 15A-2000(f)(9).

In our proportionality review, it is proper to compare the present case to those cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895 (1994). We do not find this case substantially similar to any case in which this Court has found the death penalty disproportionate. Each of those cases is distinguishable from the present case.

In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), the defendant was convicted of first-degree murder based solely upon felony murder. The victim died of cardiac arrest after being robbed and shot in the legs by the defendant. The only aggravating circumstance found by the jury was that the crime was committed for pecuniary gain. The jury found the existence of numerous mitigating circumstances including that the defendant had no significant history of prior criminal activity; that he was under the influence of mental or emotional disturbance; that he confessed and cooperated upon arrest; and that he voluntarily consented to a search of his motel room, car, home and storage bin. Finally, this defendant pled guilty during trial and acknowledged his wrongdoing before the jury. This Court determined that the death sentence was disproportionate based not only on the defendant's conduct at trial, but also in part on the fact that the defendant was only trying to rob the victim because he fired at the victim's legs and not at a more vital part of the victim's body. *Id.* at 329, 372 S.E.2d at 523. In the present case, the defendant has a significant criminal history, including at least two prior convictions for violent felonies. Further, the defendant failed to show any remorse for his actions, failed to plead guilty and failed to acknowledge his wrongdoing before the jury. Finally, the defendant shot the victim numerous times at close range in vital areas of the victim's

body. It is a testament to the violence of this crime that the repetitive gunshots caused the victim to spin around until he was shot in the back. Unlike the defendant in *Benson*, this defendant clearly wanted his victim dead.

In *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), the defendant and a group of coconspirators robbed the victim's place of business. No evidence showed who the "ringleader" of the group was. This Court vacated the sentence of death based on the fact that the defendant was only a teenager, and it did not appear that defendant Stokes was more deserving of death than an accomplice, who was considerably older and received only a life sentence. *Id.* at 21, 352 S.E.2d at 664. In the present case, the defendant was the "ringleader" and the shooter. Defendant Stokes was only seventeen years old at the time of the crime. Unlike in *Stokes*, the jury in the present case failed to find that the defendant's age was a mitigating circumstance. Finally, there was no indication that defendant Stokes had the kind of criminal history that the defendant here has accumulated.

In *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), the victim was killed during an argument in a parking lot. There was also evidence suggesting that the victim was not the intended target of the defendant. The sole aggravating circumstance found was that the murder was part of a course of conduct. This Court determined that this shooting did "not contain the viciousness and the cruelty present" in other death cases that involved only the course of conduct aggravating circumstance. The case *sub judice* is distinguishable in that the victim was clearly the defendant's target. The defendant violently shot the victim and kept shooting until finally shooting the victim in the back.

In *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant stabbed the victim twice in the chest during the commission of a robbery and burglary. This Court noted, however, that it was the defendant's accomplice who "finished" the victim by stabbing him several more times. *Id.* at 688, 325 S.E.2d at 193. The present case is clearly distinguishable in that it was the defendant who mercilessly "finished" the victim.

In *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984), the defendant shot a police officer during a struggle near the defendant's car. This Court vacated the sentence of death based upon the speculative nature of the evidence, the lack of motive and the absence of any

simultaneous offenses, together with three mitigating circumstances tending to show the defendant's lack of past criminal activity and his being gainfully employed. *Id.* at 479, 319 S.E.2d at 172. In the present case, the evidence was anything but speculative. The defendant's motive for killing the victim was clear. Finally, the defendant's history shows numerous incarcerations; assaults while incarcerated; and at least two previous violent felonies, including another armed robbery.

In *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983), the victim was shot while riding with the defendant in a car. *Bondurant* is distinguishable because the defendant immediately exhibited remorse and concern for the victim's life by directing the driver to go to the hospital. The defendant also went into the hospital to secure medical help for the victim, voluntarily spoke with police officers and admitted to shooting the victim. In the present case, by contrast, after rendering the victim helpless after shooting him once, the defendant literally held the victim's life in his hands. Instead of seeking aid for the victim, or simply leaving the scene, the defendant chose to ensure the victim's death by shooting the victim several additional times. Further, the defendant certainly showed no remorse and did not seek medical help for the victim.

In *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant flagged down the victim as the victim passed in his truck. Later, the victim's body was found in the truck. He had been shot twice in the head, and his wallet was missing. The defendant was convicted of first-degree murder, kidnapping and robbery with a dangerous weapon. This Court vacated the kidnapping and armed robbery convictions because of the insufficiency of the evidence and vacated the death sentence because there was no evidence regarding what had occurred after the defendant left with the victim. In contrast, the evidence in the case *sub judice* is precise as to the attempted armed robbery and the murder. It is equally clear that the defendant, when faced with an uncooperative victim, simply began to shoot the victim and continued to do so until the victim was no longer in his way.

Furthermore, we reiterate that the jury in the case *sub judice* found as an aggravating circumstance that the defendant had previously been convicted of a violent felony. The jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate. *See State v. Harris,* 338 N.C. 129, 449 S.E.2d 371 (1994), *cert. denied,* ⸻ U.S. ⸻, 131 L. Ed. 2d 752 (1995). We have recently noted that none of the

STATE v. LYONS

[343 N.C. 1 (1996)]

cases in which the sentence was found to be disproportionate has included this aggravating circumstance. *State v. Rose*, 335 N.C. 301, 351, 439 S.E.2d 518, 546, *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 883 (1994).

For the foregoing reasons, we conclude that each case where this Court has found a sentence of death disproportionate is distinguishable from the case *sub judice.*

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum,* 334 N.C. at 244, 433 S.E.2d at 164. Although this Court considers all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude the present case is more similar to certain cases in which we have found the sentence of death proportionate than those in which we have found the sentence of death disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

Finally, we noted in *State v. Daniels,* 337 N.C. 243, 446 S.E.2d 298 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 895 (1995), that similarity of cases is not the last word on the subject of proportionality. *Id.* at 287, 446 S.E.2d at 325. Similarity "merely serves as an initial point of inquiry." *Id.; see also State v. Green,* 336 N.C. 142, 198, 443 S.E.2d 14, 46-47. The issue of whether the death penalty is proportionate in a particular case ultimately rests "on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators, and other circumstances." *Daniels,* 337 N.C. at 287, 446 S.E.2d at 325.

Based on the nature of this crime, and particularly the distinguishing features noted above, we cannot conclude as a matter of law that the jury's recommendation or the sentence of death was excessive or disproportionate. We hold that the defendant received a fair trial and sentencing proceeding, free of prejudicial error.

NO ERROR.

Justice WHICHARD concurring.

On the issue presented by defendant's sixth assignment of error, I joined in Justice Frye's dissenting opinions in *State v. McCarver,*

341 N.C. 364, 462 S.E.2d 25 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 482 (1996), and *State v. McLaughlin,* 341 N.C. 426, 462 S.E.2d (1995), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 879, (1996). I continue to believe those dissenting opinions were correct. A majority of this Court ruled to the contrary, however, and the United States Supreme Court has since denied certiorari in those cases. I thus now consider myself bound by the majority position and will no longer dissent or concur in the result in cases presenting the issue of unanimity as to Issues Three and Four.

Justice FRYE joins in this concurring opinion.